IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 15, 2022

## STATE OF TENNESSEE v. TADARIUS L. CLIFT

**Appeal from the Criminal Court for Davidson County**
**No. 2014-D-3068    Monte Watkins, Judge**
_____

### No. M2021-00425-CCA-R3-CD
_____

The Defendant, Tadarius L. Clift, appeals his convictions for first degree premeditated murder and three counts of reckless endangerment, for which he received an effective sentence of life imprisonment plus four years. On appeal, the Defendant challenges the sufficiency of the evidence supporting the convictions and the trial court's decision to limit defense counsel's cross-examination of a witness for the State. Upon reviewing the record, the parties' briefs, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Taylor M. Durrett, Lebanon, Tennessee (on appeal), and Michael Freeman, Nashville, Tennessee (at trial), for the appellant, Tadarius L. Clift.

Herbert H. Slatery III, Attorney General and Reporter; David H. Finley, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Deborah Housel and Ronald Dowdy, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

The Defendant was charged with first degree premeditated murder and three counts of reckless endangerment for shooting and killing Mr. Nathaniel Moore ("the

victim") on the evening of September 23, 2014, as the victim was sitting in a parked car located off Edgehill Avenue in Nashville with Ms. Shaundrea Morris, who was the victim's girlfriend and the Defendant's sister, and Ms. Morris's two young children. Ms. Morris told multiple people, including the police, that the Defendant was the shooter, but she testified at trial that she was unable to identify the shooter. The defense at trial was that the Defendant was not the shooter.

Officer Charles Griffin of the Metropolitan Nashville Police Department ("MNPD") responded to the scene of the shooting and was assigned to stand with Ms. Morris while at the scene. He testified that Ms. Morris was "hysterical" and was screaming and crying. He had to push Ms. Morris back to prevent her from getting to the car where the victim's body was located. Ms. Morris wanted to accompany the victim to the hospital, but Officer Griffin told her that she needed to remain at the scene to assist in the investigation.

Officer Griffin testified that he spoke to someone who described the shooter as "dark skin, male, black, … wearing a gray hoodie with the hood up." Officer Griffin did not recall who provided the description. MNPD Officer Michael Collazo also responded to the scene and testified that the suspect was described to him as an African American man who was wearing a gray hoodie and either pants or shorts that were a camouflage pattern.

Ms. April Patel, the victim's sister, testified that she and her mother went to the scene of the shooting where Ms. Morris was "crying hysterically." Ms. Morris told Ms. Patel, "[H]e['s] gone." Ms. Patel stated that she asked Ms. Morris who had shot the victim and that Ms. Morris responded, "[M]y brother," which Ms. Patel understood to mean the Defendant. Ms. Patel stated that Ms. Morris told her this more than once.

Mr. Monquez Meeks, a friend of the victim, testified that he went to the scene of the shooting and saw Ms. Morris, who was screaming, "I told my brother he didn't have nothing to do with it." Mr. Meeks stated that Ms. Morris appeared to refer to something that occurred days prior to the victim's death. Mr. Meeks spoke to Ms. Morris over the telephone the following day. He said that Ms. Morris was crying but was calmer than she had been at the scene. He testified that Ms. Morris "said her brother did it. She said she told him he didn't have nothing to do with the situation that was going on, she said she [had] seen him, she [had] seen his face. He came [from] behind the dumpster, they w[ere] talking, he just shot him." Mr. Meeks stated that Ms. Morris was afraid and said her brother would harm her.

Mr. Meeks testified that during a telephone conversation with Ms. Morris two or three days later, she maintained that her brother was not the shooter and that two men

wearing black hoodies committed the shooting. She said she saw their guns but did not see their faces. Mr. Meeks stated that "everything changed, it wasn't the same story."

On cross-examination, Mr. Meeks testified that on the day before he first spoke to Ms. Morris over the telephone about the shooting, he heard her screaming out, "[M]y brother did it, my brother did it." Mr. Meeks stated that approximately one week later, he went to Ms. Morris's house because someone had broken into the home and "trashed" it. He said Ms. Morris was scared and felt that her brother was going to "do something" to her. Neighbors told Mr. Meeks that two men and a woman had broken into the home.

Ms. Donkeithea Moore, the victim's sister, also went to the scene and testified that Ms. Morris was "in shock" and kept saying that her brother killed the victim. Ms. Moore said she had a telephone conversation with Ms. Morris that she believed occurred later that night after Ms. Morris had calmed somewhat but was still upset. Ms. Moore asked Ms. Morris what had occurred, and Ms. Morris replied that she did not know why her brother shot the victim.

Ms. Moore testified that on September 24, 2014, she went to the police department, spoke to MNPD Sergeant Steven Bowers, and agreed to call Ms. Morris while their call was being recorded. An audio recording of the telephone conversation was entered as an exhibit at trial and played for the jury. During the call, Ms. Moore asked Ms. Morris whether she had spoken to the Defendant, and Ms. Morris stated that she had not. Ms. Moore asked whether it was "just him" or whether "he" had additional people with "him," and Ms. Morris replied, "I think it was just him by hi[m]self." Ms. Morris stated that the police had not tried to contact her. Ms. Morris told Ms. Moore, "They told me not to." Ms. Moore asked, "They told you not to talk to them?" Ms. Morris replied, "Yeah."

Ms. Shaundrea Morris testified that she had known the victim since she was fourteen years old and that he was the father of one of her three children. She said the Defendant, whom she called "T.D.," was her only brother. She stated that prior to the shooting, she and two of her children were visiting a family member and that the victim was "out there doing whatever he do[es]." When they were leaving, Ms. Morris and the victim each secured a child into a car seat. Ms. Morris testified that after she started the car, a man wearing a black hoodie and "[a]rmy fatigue pants" approached the car, spoke to the victim, and then shot him three or four times.

Ms. Morris maintained that she did not recall what she told the police about the shooting. She recalled calling Sergeant Bowers on only one occasion. The State entered into evidence Ms. Morris's video and audio-recorded interview with police conducted on September 27, 2014, four days after the shooting. Ms. Morris told the officers that she,

the victim, and her four-year-old and one-year-old children were visiting the victim's aunt prior to the shooting. They left his aunt's home and went to Ms. Morris's car where Ms. Morris and the victim each buckled a child into a car seat. Ms. Morris sat in the driver's seat, while the victim sat in the front passenger seat with his window rolled down slightly. Ms. Morris stated that a man wearing a hoodie and "[a]rmy fatigue pants" walked from the side of a nearby dumpster and approached the passenger side of the car. Ms. Morris said the man stood close to the car, but she did not believe he touched the car. She told the officers that the man spoke to the victim prior to shooting him. She overheard the man say, "What's up?" and the victim respond, "What's up?" The man stated, "I've been hearing some s**t." The victim replied, "What s**t have you been hearing?"

The officers asked Ms. Morris whether the victim had a "beef" with anyone. She stated that a few weeks prior to the shooting, "Man Man" got into an altercation with her and slapped her after he accused her and her friends of stealing his drugs. Ms. Morris stated that on the following day, "Man Man" got into an altercation with Ms. Morris's sister. The Defendant confronted "Man Man," who made a statement about having someone retrieve "his AR." Ms. Morris stated that sometime later, her mother's home was shot up and that her mother accused the victim of being involved. Ms. Morris said she spoke to the Defendant, who stated that he did not know why his mother believed the victim was involved because someone had told him that two other people were responsible. Ms. Morris stated that others told the Defendant that the victim was involved in shooting up his mother's home. However, Ms. Morris stated that neither the Defendant nor the victim told her that they had any issues with each other.

Ms. Morris told the officers that she believed the victim knew the person who killed him. She also told the officers that she initially believed the Defendant had shot the victim and that she had told one of the victim's sisters that she believed the Defendant was the shooter. Ms. Morris said others had informed her that following the shooting, she was screaming, "Why T.D.? Why did you do that?" She said she had since spoken to the Defendant, who denied shooting the victim and explained that he would have killed "Man Man," who the Defendant believed shot up his mother's home, before he would have killed the victim.

Ms. Morris told the officers that she did not know the identity of the shooter because she never saw the shooter's face. She maintained she only saw the shooter's black hands and gray hoodie. When the officers continued to question her, she began crying and said she was afraid and had not slept in three days. She denied saying that she saw the shooter and maintained she only said the shooter "sounded like my brother." She explained to the officers that she initially believed the Defendant was the shooter because

- 4 -

others had told the Defendant that the victim was involving in shooting up their mother's home.

Ms. Morris told the officers that people in her neighborhood had warned her to be careful, and she claimed she did not know why. She denied that the Defendant had threatened her. She said that the Defendant had denied shooting the victim, that she "wanted to believe" him, that she thought she had recognized the shooter's voice as belonging to the Defendant, and that she did not know whether the Defendant was the shooter. She said that since the shooting, she had told her mother and the victim's sister that she was not sure that the Defendant was the shooter.

During the interview, both officers explained to Ms. Morris the possibility that she could be charged with accessory after the fact, and one officer stated that her children could be removed from her custody if she were charged. Ms. Morris became upset, and both officers stated that she was not in trouble at that time. Ms. Morris said that she was unsure whether she heard the Defendant's voice when the shooter spoke, that the shooter's voice "sounded like" the Defendant's voice, and that she did not see the shooter's face. She then stated that the shooter looked like the Defendant and that she had believed the Defendant was the shooter based upon the shooter's voice and the conversation between the shooter and the victim. An officer asked Ms. Morris whether the voice she heard prior to the shooting belonged to her brother, and Ms. Morris nodded her head affirmatively. The officer then asked whether the person she saw was her brother, and she responded that she believed that the Defendant was the shooter but that she was unsure.

Ms. Morris testified at trial that she did not recall her friend, Ms. Desiree Compton, calling MNPD Sergeant Steven Bowers on her behalf. Ms. Morris later testified that she recalled calling Sergeant Bowers while she was staying at her friend's home. She agreed that she was scared and that Sergeant Bowers arranged to have her moved to another location as a result.

The audio recording of the call with Sergeant Bowers was entered into evidence and played for the jury. In the recording, Ms. Compton told Sergeant Bowers that Ms. Morris, who had been staying with her, received a call from the Defendant and that the Defendant yelled at Ms. Morris because police officers came to his home. Ms. Compton said Ms. Morris was afraid. Sergeant Bowers then spoke to Ms. Morris, who said that the Defendant did not threaten her but wanted to know why the police were at his home. Ms. Morris said she explained to the Defendant that she told the officers that she thought he was the shooter but that she was unsure. Ms. Morris said that the Defendant hung up on her and that she was scared. Sergeant Bowers asked Ms. Morris if the Defendant was the person whom she saw on the night of the shooting, and Ms. Morris responded, "Yes. He

did it. He did it." She stated that she saw the color of the shooter's skin and heard his voice. The officer asked her whether she saw the Defendant approach the car, and Ms. Morris affirmed that she did. Ms. Morris requested protection, and the officer agreed to send another officer to her location.

On direct examination, Ms. Morris testified that she did not know whether the Defendant was the person who walked up to her car. She explained, "The detective kept making me, just kept pressuring me to say yes." She maintained that she identified the Defendant as the shooter at the scene because "the police w[ere] scaring me to say that" and that she told the officers that she thought the Defendant was the shooter but also told them she was uncertain. She testified that during the interview, she told the officers that she did not see the shooter's face. She acknowledged that the shooter's voice "sound[ed] like" the Defendant's voice but stated that "anybody can sound alike." She denied telling Mr. Meeks that the Defendant killed the victim. She testified that she still did not know who killed the victim because she never saw the shooter's face.

An audio recording of a telephone call by Ms. Morris in June 2015 was entered into evidence and played for the jury. In the recording, Ms. Morris discussed her relationship with her family and stated that she did not understand her mother. Ms. Morris said that she did not "make him kill him" and that it was "his choice to do it."

On cross-examination, Ms. Morris testified that the shooting occurred around 7:30 or 7:45 p.m. and that it was dark outside. She became aware that someone was outside after she entered the car. She said she did not see the shooter walk up to the car or see the shooter's face. She only saw the shooter from below his chin to his thigh as he was standing outside the car. She saw the shooter's hands, which were dark, but she did not know whether he was wearing gloves. She stated that whenever her older child saw the Defendant, her child would become happy and say the Defendant's name. According to Ms. Morris, her children did not react when the shooter approached the car.

Ms. Morris testified that the victim was smiling as the shooter approached and that while the shooter and the victim spoke to each other briefly before the shooting, she could not recall what either of them said. The victim did not seem nervous or concerned. Ms. Morris stated that the shooter used a silver gun. When the shooting began, she opened her door to try to escape but was unable to do so because she was wearing her seatbelt. Ms. Morris said that following the shooting, she "blanked out" and did not recall the events that followed, including stating, "Why T.D.? Why?" She did not recall telling Mr. Meeks or others that the Defendant was the shooter.

Ms. Morris testified that she did not know of anyone who would have wanted to hurt the victim. She maintained that neither the Defendant, who was seventeen years old

at the time of the shooting, nor any other family member threatened her. Ms. Morris explained that she stayed with a friend rather than with family members following the shooting because her friend arrived at the scene prior to her mother and her friend lived near where Ms. Morris lived. Ms. Morris stated that her oldest sister told her that someone had offered to pay Ms. Morris $10,000 if she refused to testify at trial. Ms. Morris said that no one in her family had the money with which to pay her and that she did not know who would pay such a large amount of money to secure her silence. She stated that she would not lie to protect the Defendant and that she would testify against the Defendant if she had seen him shoot the victim.

Ms. Morris testified that she had not slept for three days when she was interviewed by the police, that she was tired and upset, and that she did not recall what she told the officers. She said the officers never asked if she needed a break and never offered to continue the interview at a later time after she had the opportunity to rest. She acknowledged that the officers told her that she could be charged as an accessory after the fact and that her children could be removed from her home if she did not cooperate in the investigation.

Ms. Morris agreed that she had spoken to the Defendant before Ms. Compton called the police on her behalf. Ms. Morris testified that while the Defendant was upset, he did not threaten her or make her feel threatened. She said that although she was scared and asked the officer for protection, she did not know from whom she needed protection. She agreed that she was under a great amount of pressure. She stated that someone broke into her home one or two weeks after the shooting and that a television, a gun, and her children's clothes and shoes were taken but that she did not believe the break-in was related to the shooting.

Investigator Lynette Mace with MNPD crime scene unit responded to the scene, where she found Ms. Morris's parked white Kia Rio with the passenger side door open. The passenger side of the car was approximately three feet from a dumpster and a nearby gate. She located three nine-millimeter cartridge casings on the ground near the car. She collected a Samsung cell phone from the front seat of the car. The cell phone had an entry defect from a bullet that traveled through the cell phone at a slight angle and exited through the front of the cell phone. A projectile fragment was located near the cell phone, and a second projectile fragment was collected from the interior pocket of the front passenger door.

Evidence was presented at trial that the Defendant was five feet, nine inches tall. Investigator Mace created a diagram to compare the size of Ms. Morris's Kia Rio with a person of the Defendant's height and determine that the car's window would end at the person's waistline. On cross-examination, Investigator Mace testified that the location at

which the window fell on the person could be affected by factors such as the angle at which the car was parked and whether the ground was level. She acknowledged that the passenger's view of the person standing outside the car could be affected by the length of the passenger's legs or torso and the distance between the car and the location at which the person outside the vehicle is standing.

On September 30, 2014, MNPD Detective James Slusser and Sergeant Bowers went to the home of Ms. Morris's mother in an effort to speak to Ms. Morris's mother. The Defendant opened the door when the officers knocked and informed them that their mother was not there. The Defendant called her on his cell phone and gave his cell phone to Sergeant Bowers, who stepped away to speak to her. Detective Slusser testified that he confirmed with the Defendant that he also lived at the home. Detective Slusser asked the Defendant which bedroom belonged to him, and the Defendant stated that his bedroom was located straight into the home and in the back. Detective Slusser informed the Defendant that they were not there to arrest him that night and that they only wanted his side of the story.

On October 2, 2014, officers executed a search warrant on the home where the Defendant lived. Detective Zachariah Bevis testified that Detective Slusser had advised him that the Defendant's bedroom was located straight down the hallway from the entrance. Detective Bevis said officers collected items of clothing that he believed were similar to those that the shooter had been described as wearing. Investigator Mace identified a pair of camouflage shorts and a gray hoodie that she collected from the home, and she acknowledged that no blood appeared to be on the clothing.

MNPD Sergeant Steven Bowers testified that he was the lead investigator in the case and responded to the scene after the victim had been transported to the hospital by ambulance. When he arrived, Ms. Morris was with her mother and crying "hysterical[ly]," and he knew that she would be unable to provide a great deal of information as a result. Sergeant Bowers asked an officer to stay with Ms. Morris while he spoke to some of the neighbors. Sergeant Bowers spoke with Ms. Morris after she calmed down, and she stated that prior to the shooting she, her children, and the victim had been to the home of the victim's aunt. She stated that she and the victim secured the children in her car and then entered the car. Ms. Morris told Sergeant Bowers that an African American man approached the car and told the victim, "I['ve] been hearing some s**t." She said Mr. Moore responded, "What s**t [have] you been hearing?" Ms. Morris could only recall that portion of the conversation occurring before the victim was shot. Ms. Morris did not provide a description of the shooter's clothing at that time.

Sergeant Bowers testified that he had a chaplain notify Ms. Morris, her mother, and the victim's aunt of the victim's death. Sergeant Bowers stated that the victim's

mother was not present because she had passed out at the scene earlier. Ms. Morris and the victim's aunt were "hysterical" when they learned of the victim's death, but Ms. Morris's mother had a "blank look on her face" and did not exhibit a great amount of emotion. Sergeant Bowers said that Ms. Morris did not appear to be very forthcoming with information and seemed to be unwilling to speak to him without her mother being present.

Sergeant Bowers testified that on September 24, 2014, the day after the shooting, he received a call from an officer, who stated that Ms. Donkeithea Moore came to a police precinct seeking to share information she had learned about the shooting. Sergeant Bowers interviewed Ms. Moore, who reported that Ms. Morris told her that the Defendant killed the victim. Sergeant Bowers was present when Ms. Moore made a controlled telephone call to Ms. Morris.

While at the scene, Ms. Morris told Sergeant Bowers that she would come to the police precinct for an interview on the following day. However, Ms. Morris did not come as promised. Sergeant Bowers called her multiple times, and when he was able to reach her, she said that she was attending a candlelight vigil for the victim with the victim's family. Ms. Morris agreed to come to the police precinct for an interview at 2:30 p.m. on the following day, September 25th. Ms. Morris did not come to the interview as promised, and Sergeant Bowers was unable to reach her by telephone on September 25th and 26th. On September 27th, Ms. Morris called Sergeant Bowers and stated that she was ready to be interviewed.

Sergeant Bowers testified that prior to his interview with Ms. Morris, he was unaware that Ms. Morris stated at the scene, "Why T.D.? Why, why did you do that?" Sergeant Bowers stated that following the interview, he spoke to Mr. Meeks, whose testimony at trial was consistent with his statements to Sergeant Bowers. Ms. Morris gave Sergeant Bowers the cell phone numbers of the Defendant and her mother. Officers prepared a search warrant to obtain the call logs and cell tower locations associated with each cell phone number, both of which were in the name of Ms. Morris's mother, and Sprint provided the information pursuant to the warrant.

Sergeant Bowers stated that on September 29th, two days after he interviewed Ms. Morris, she called him and reported that someone had broken into her home and taken televisions and other property. She was afraid because she thought that the burglary might be associated with the shooting, and she moved to an undisclosed location. Sergeant Bowers testified regarding the execution of the search warrant at the home where the Defendant and Ms. Morris's mother lived. He said that when he returned to the police precinct, he received a call from Ms. Morris's friend and that he requested additional police patrol in the area where Ms. Morris was staying as a result of the call.

Sergeant Bowers testified that the victim's DNA was not found on the clothing seized from the Defendant's home. The murder weapon was never located, and fingerprints lifted from Ms. Morris's car following the shooting were of no value.

On cross-examination, Sergeant Bowers testified that when he spoke to Ms. Morris at the scene after she was calmer, she seemed "withdrawn, as far as the information that she was relaying to" him. He acknowledged that Ms. Morris could have been in shock following the shooting. He stated that his interview with Ms. Morris at the police precinct lasted two hours, during which Ms. Morris broke down and cried. He acknowledged that the other detective present during the interview mentioned that Ms. Morris could be charged with accessory after the fact. Sergeant Bowers did not offer to suspend the interview when Ms. Morris stated that she had not slept in three days. He explained that Ms. Morris had not shown up when other interviews were scheduled and that he believed this could be his only opportunity to interview her. Sergeant Bowers stated that Ms. Morris had made inconsistent statements about whether the Defendant was the shooter.

Sergeant Bowers testified that a detective spoke to two witnesses at the scene, who reported seeing a silver vehicle arrive and then leave around the time of the shooting. Sergeant Bowers did not believe the vehicle was associated with the shooting and noted that multiple witnesses saw people running following the shooting, which he said was a typical reaction to a shooting.

MNPD Detective Joseph Chadwick High with the Surveillance and Investigative Support Unit, analyzed the cell phone records for a cell phone number that Ms. Morris acknowledged at trial belonged to the Defendant. The subscriber was listed as Ms. Morris's mother. Detective High focused upon the usage of the cell phone between the hours of 6:00 p.m. and 12:00 a.m. on the evening of the shooting and around the areas of McFerrin Park and Edgehill Avenue, where the shooting occurred. He produced a report of his analysis and testified regarding the report at trial.

Detective High testified that the handset received a call at 6:34 p.m. and communicated with a cell tower located in the area of downtown Nashville. According to Detective High's report, at 6:41:23 p.m., the handset made a call, which ended by communicating with a cell tower that covered an area encompassing McFerrin Park. From 6:53:02 p.m. through 7:15:39 p.m., the handset made and received calls and communicated with cell towers that covered an area encompassing McFerrin Park. At 7:35:31 p.m., the handset received a call where the caller used a star sixty-seven feature to block the caller's identity. The handset communicated with a tower near Edgehill Avenue. At 8:07 p.m., the handset received a call and communicated with a tower located away from Edgehill Avenue and south from downtown Nashville. The remaining

calls received and placed from the handset used this cell tower for the rest of the evening. Detective High testified that the use of the different cell towers could show movement through the area.

On cross-examination, Detective High agreed that a handset does not necessarily use the tower with the closest signal but uses the tower with the most efficient signal. He acknowledged that the areas covered by cell tower sectors could overlap and that when too many people are using the same tower in the area, a handset will use a different tower. He did not determine whether there were any events in the Nashville area that evening where large groups of people gathered so as to affect cell tower usage. He agreed that pinpointing the exact location of a handset was difficult based upon the data in his possession and that a signal for a cell tower could span an area more than five miles away and could "theoretically" span an area ten to fifteen miles away.

Dr. Thomas Deering, a forensic pathologist, conducted the victim's autopsy and testified that the victim sustained two gunshot wounds. One bullet entered the victim's right temple, struck his skull, brain, and facial bones, and exited through his left cheek. No bullet associated with the wound was recovered. The second bullet entered through the victim's neck, struck the vertebra column and neck bones, traveled toward the shoulder, struck the large artery underneath the collarbone, the left lung, a lateral rib, and ended in soft tissue. Dr. Deering recovered part of a fully-jacketed bullet. Both bullets traveled right to left and downward.

Dr. Deering observed a band of stipple between the two gunshot wounds, indicating that the gun was six to twenty-four inches away when fired. He stated that the gunshot entry wound to the victim's right temple was round, which is the typical shape of an entry wound. However, the gunshot entry wound to the victim's neck was in an irregular "D-shape," indicating that the bullet struck another object before entering the victim's neck. Dr. Deering noted a defect in a cell phone and an injury to the victim's hand and said the bullet could have struck them before entering the victim's neck. Dr. Deering concluded that the victim's cause of death were multiple gunshot wounds and that his manner of death was homicide.

At the conclusion of the proof, the jury convicted the Defendant of one count of first degree premeditated murder of the victim and three counts of reckless endangerment relating to Ms. Morris and her two children. The trial court sentenced the Defendant to an effective term of life imprisonment plus four years. The Defendant filed a motion for new trial, which the trial court denied. The Defendant appeals his convictions, asserting that the evidence is insufficient to support his convictions and that the trial court erroneously limited his cross-examination of Ms. Morris.

# ANALYSIS

## I. Sufficiency

The Defendant challenges the sufficiency of the evidence supporting his convictions, asserting that the evidence is insufficient to establish his identity as the shooter. The State responds that the evidence is sufficient to support his convictions. We agree with the State.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

First degree murder is the premeditated and intentional killing of another. T.C.A. § 39-13-202(a)(1). As related to the instant case, a person commits the offense of reckless endangerment "who recklessly engages in conduct that places or may place another person in imminent danger of death of serious bodily injury" and the offense is committed with a deadly weapon. T.C.A. § 39-13-103(a), (b)(1).

The Defendant does not assert that the evidence is insufficient to establish the elements of the offenses. Rather, he maintains that the evidence fails to establish his identity as the shooter. Identity is an essential element of every crime. *State v. Bell*, 512

S.W.3d 167, 198 (Tenn. 2015). The identification of the perpetrator of a crime is a question of fact for the jury. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). In resolving questions of fact, such as the identity of the perpetrator, "'the jury bears the responsibility of evaluating the conflicting evidence and accrediting the testimony of the most plausible witnesses.'" *State v. Pope*, 427 S.W.3d 363, 369 (Tenn. 2013) (quoting *State v. Hornsby*, 858 S.W.2d 892, 897 (Tenn. 1993)).

The evidence presented at trial established that Ms. Morris told police officers and multiple other people that the Defendant was the shooter. While at the scene and emotional from the shooting, Ms. Morris told the victim's friends and family members that the Defendant shot the victim. Although Ms. Morris testified at trial that she did not see the shooter clearly and was unable to identify him, the State entered recordings of Ms. Morris's interactions with police officers during which she told them that the Defendant was the shooter and that she recognized the Defendant's voice when he spoke to the victim prior to shooting him. The trial court granted the State's request to enter these recordings as substantive evidence pursuant to Tennessee Rule of Evidence 803(26), and through its verdict, the jury rejected Ms. Morris's testimony at trial and credited her statements to the police.

Ms. Morris told the officers that the victim had been implicated in the prior shooting of the home where her mother and the Defendant lived. After implicating the Defendant, Ms. Morris refused to stay with her family and sought police protection. Clothes similar to those worn by the shooter were seized by officers while executing a search warrant at the Defendant's home. Cell phone records indicated that the Defendant's cell phone utilized cell towers near the crime scene around the time of the shooting. We conclude that this evidence, when viewed in the light most favorable to the State, was sufficient to establish the Defendant's identity as the shooter.

## II. Limitation of Cross-Examination

The Defendant contends that the trial court erred in limiting his cross-examination of Ms. Morris regarding the victim's background and regarding others who may have had a reason to shoot him. The State responds that the Defendant is not entitled to relief because he failed to make an offer of proof and otherwise waived the issue. We agree with the State.

Prior to trial, the State filed a motion in limine, requesting that the trial court exclude evidence regarding the victim's reputation for violence, prior bad acts, reputation for carrying a firearm, and drinking habits. The State also requested that the trial court exclude any evidence of specific acts of violence or threats of violence by the victim toward third persons and that the Defendant be allowed to testify regarding only those

prior acts of violence committed by the victim about which the Defendant had knowledge prior to the shooting. During a hearing on the motion, defense counsel agreed that the Defendant was not claiming self-defense but was maintaining that an unknown third person was the shooter. The trial court granted the State's motion.

On cross-examination of Ms. Morris at trial, defense counsel asked her why she and the victim were in the area of the shooting, and Ms. Morris replied, "So he can do what he do[es]." The State requested a hearing outside the jury's presence. During a bench conference, defense counsel stated that he did not know whether Ms. Morris's answer implied that the victim was selling drugs on the night of the shooting and that he was "not trying to get in anything about selling drugs." The trial court stated that Ms. Morris implied that the victim was engaged in illegal activity, which would fall within the State's motion in limine. Defense counsel argued that by granting the State's motion, the trial court was "severely limiting" the Defendant's possible defenses. Defense counsel also stated, "I'm not trying to get in that he's a drug dealer. I didn't know he was a drug dealer, it's not germane to this."

During a hearing outside the jury's presence, the trial court asked Ms. Morris to clarify her answer to defense counsel's question, and Ms. Morris stated that the victim was selling drugs. The trial court instructed Ms. Morris not to mention anything about drugs or "any kind of violence." Defense counsel requested that he be allowed to question Ms. Morris about whether she knew anyone who wanted to harm the victim, and the State objected to the line of questioning. The trial court granted defense counsel's request to ask Ms. Morris the question and instructed defense counsel that once he asked the question, he should "move on." On cross-examination in the jury's presence, defense counsel asked Ms. Morris whether she could think of anyone who might have had a reason to want to hurt the victim, and Ms. Morris replied, "No."

The Defendant alleged in his motion for new trial and on appeal that at the time of the victim's death, the victim was under investigation for committing multiple aggravated robberies of several drug dealers in Davidson County. The Defendant maintains that the evidence would have established that the victim was in the area of the shooting to sell the drugs that he had received as a result of the robberies and that the victim had been told that as a result of the robberies, several gangs had placed "hits" on him. According to the Defendant, Ms. Morris had first-hand knowledge of the victim's character and criminal activities and was prepared to testify regarding the victim's activities prior to the shooting.

However, at trial, defense counsel stated that he was unaware that the victim sold drugs, that he did not intend to elicit testimony that the victim was a drug dealer, and that the victim's drug dealing was "not germane to this." When defense counsel asked Ms.

- 14 -

Morris whether she knew of anyone who might have wanted to harm the victim, she replied, "No." The Defendant did not make an offer of proof in support of his claims listed in his motion for new trial and alleged on appeal. In light of defense counsel's statements at trial and the Defendant's failure to make an offer of proof, we conclude that this issue is waived. *See State v. McCaleb*, 582 S.W.3d 179, 199 (Tenn. 2019) (holding that the State's failure to make an offer of proof regarding the excluded evidence precluded the trial court from making specific findings regarding the proposed testimony and precluded the appellate court from considering the issue); *State v. Hall*, 958 S.W.2d 679, 691 n. 10 (Tenn. 1997) ("[G]enerally, if an offer of proof [regarding an evidentiary ruling] is not made, the issue is deemed waived and appellate review is precluded.").

## CONCLUSION

We conclude that the Defendant is not entitled to relief, and we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE